|  | : |  |
|---|---|---|
| UNITED STATES | : | UNITED STATES DISTRICT COURT |
|  | : | DISTRICT OF NEW JERSEY |
| v. | : |  |
|  | : | No. 12-cr-00303-NLH |
| ADAM LACERDA, et al., | : |  |
|  | : |  |
| Defendants | : |  |

MEMORANDUM OF LAW
IN SUPPORT OF POST-TRIAL MOTIONS
OF DEFENDANT GENEVIEVE MANZONI

INTRODUCTION

Defendant Genevieve Manzoni has moved for a judgment of acquittal or,
in the alternative, for a new trial following her conviction on one conspiracy count and
one substantive fraud count in connection with her work as a sales person for the VO
Group.  The Court is intimately familiar with the facts, having presided over the lengthy
trial in this case, so this Memorandum will not recite the facts at length but will refer to
them only in sufficient detail to frame the issues raised by these motions.

By way of overview, Ms. Manzoni's role at the VO Group was
substantially different than that of the other three defendants who were convicted.  The
evidence against her concerned her role in making telephone calls to prospective
customers.  She was not involved in managing the operation, drafting the script,
controlling the finances, or training others.  The "settlement pitch," as the government
termed it, was the heart of the case and was written and well-established at the VO Group
long before Ms. Manzoni arrived.  When she arrived at the VO Group in October 2010,
recruited by her former boss, Fran Santore, the VO Group had all of the trappings of a

legitimate business.   Ms. Manzoni worked at VO Group for approximately a month before the FBI search occurred after which the settlement pitch evidently was abandoned. The prosecution carefully structured its case to focus on the settlement pitch and on the representations to customers that were being made in the time frame prior to the search. Ms. Manzoni left the VO Group in the Spring of 2011 having become disillusioned in the business and having concluded the VO Group was not living up to what it promised its customers.

Ms. Manzoni's much more limited role than that of the Lacerdas and Ian Resnick, coupled with her good faith defense, made it crucial that the jury be able to separate her circumstances from those of her co-defendants.   Unfortunately, a combination of procedural rulings and unfairly prejudicial evidence resulted in a cascade of prejudice.   Under the circumstances, the jury's verdict should be reversed and a judgment of acquittal entered or, in the alternative, a new trial should be granted.

<u>ARGUMENT</u>

I.    THE TIMESHARE CHARGES
      SHOULD HAVE BEEN SEVERED
      <u>FROM THE UNEMPLOYMENT CHARGES</u>

As the Court was able to observe at trial, the prosecution's presentation of the unemployment fraud charges against Ms. Manzoni had no connection whatsoever to the timeshare scheme that was the focus of much of the case.   Far from bearing out the prosecution's pretrial representations about factual nexus and the efficiency of one trial, what occurred in actuality was the presentation of two separate cases lumped together in a single proceeding.

The impact of the joinder of charges was substantially prejudicial, notwithstanding Ms. Manzoni's acquittal on the unemployment counts.   The fact that Ms. Manzoni was accused of engaging in two separate and unrelated fraudulent schemes inevitably would have given rise to "where there's smoke, there's fire" thinking on the part of some jurors.   And the fact that the unemployment charge against her mirrored the unemployment charges against Ian Resnick and Ashley Lacerda could only have heightened the prejudicial spillover, leading jurors perhaps unconsciously to feel that it was likely Ms. Manzoni was associated in some unsavory activities with Mr. Resnick and Ms. Lacerda.

The mere fact that she was acquitted does nothing to allay these concerns. The most logical explanation for the acquittal was that the jury realized that the government's only witness on the unemployment charges – NJ Department of Labor investigator Michael Marich – was completely unknowledgeable about the unemployment system and that the documentary evidence pertaining to Ms. Manzoni had not been explained to their satisfaction.   Thus, the jury was understandably unwilling to convict Ms. Manzoni solely on the slender reed of Marich's testimony.   In this regard, the unemployment case against Ms. Manzoni stands in stark contrast to the unemployment evidence against Mr. Resnick and Ms. Lacerda which was of a very different character, not dependent at all on an interpretation of complex and confusing agency documents. Indeed, their defense to the unemployment charge could fairly be said to be an acknowledgement of the violation but an effort to claim that it should not warrant a criminal sanction, in stark contrast to Ms. Manzoni's defense which was that the unemployment records showed she complied with the law.

But the mere fact that the jury was understandably unwilling to convict Ms. Manzoni based on Mr. Marich's weak testimony did nothing to erase the sort of spillover impact and other forms of prejudice that the joinder rules were intended to prevent.  The verdict against Ms. Manzoni in this case may well have been a compromise between some jurors who believed her guilty of both schemes and some jurors who felt her guilty of neither.  The jurors never should have had two unrelated schemes presented to them in a single trial, and especially should not have had the unemployment and timeshare cases tried together in circumstances that inevitably led to prejudicial spillover, her acquittal on the unemployment count notwithstanding.

Prior to trial, the prosecution urged that judicial efficiency would be served by the joint trials of the unemployment scheme and the timeshare scheme.  The reality turned out to be otherwise.  There was none of the interconnection that would justify joinder.

As argued in greater detail previously, this case completely fails the test of Rule 8(b) of the Federal Rules of Criminal Procedure which provides:

> Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

F.R.Crim.P. 8(b).  The requirement that there be a "series of acts or transactions" requires more than mere temporal or evidentiary overlap between to separate schemes.  The separate timeshare fraud and unemployment fraud charges failed that test because they were not alleged to be part of any common scheme and were not based on the same series of acts or transactions.

4

Crucially, the focus of the misjoinder inquiry must be on the nature of the offenses, not mere evidentiary overlap. That is, the "series" of acts and transactions which is the lynchpin to joinder is premised on logical interrelationship and connections, not merely temporal or evidential coincidence. In the words of the Third Circuit, what is required is a real nexus. *United States v. Jimenez*, 513 F.3d 62, 82–83 (3d Cir. 2008) ("there must exist a transactional nexus in that the defendants must have participated in 'the same act or transaction, or in the same series of acts or transactions,' before joinder of defendants in a multiple-defendant trial is proper."); *accord United States v. Joyner*, 201 F.3d 61, 75 (2d Cir. 2000) ("logical nexus").

The Third Circuit requires a much greater connection between separately charged schemes in order to justify a joint trial than is found in the timeshare scheme and the unemployment scheme in this case:

> We have found sufficient connections between offenses undertaken in furtherance of and in association with a charged enterprise or conspiracy. *Cf. Irizarry,* 341 F.3d at 289–90 (concluding same act or transaction requirement satisfied where indictment charged criminal acts either as predicates for racketeering or as acts undertaken in furtherance of commonly charged RICO enterprise); *Eufrasio,* 935 F.2d at 570–71 (finding proper the joinder of offenses which constituted a single series of related acts furthering the RICO enterprise and its purposes). In addition, counts are similar if they are "somewhat alike" or share "a general likeness," or otherwise have a sufficient logical connection and can be tried using the same evidence. *See United States v. Rivera,* 546 F.3d 245, 253 (2d Cir. 2008); *United States v. Graham,* 275 F.3d 490, 512 (6th Cir. 2001) ("[W]hen the joined counts are logically related, and there is a large area of overlapping proof, joinder is appropriate."). Moreover, offenses may be joined if they occurred within a relatively short period of time of each other and the evidence of each overlaps. *See United States v. Donaldson,* 978 F.2d 381, 391 (7th Cir. 1992).

*United States v. Heilman, supra*, 377 Fed.Appx. at 202.   The facts of the cases cited by the Third Circuit elucidate the point.  For example, in the *Donaldson* case cited by the Third Circuit:

> Here, within a four-week period, two banks were each robbed twice, two banks were robbed on the same day, and all the banks were within a few blocks of each other. The handwriting evidence for two of the counts overlapped, and the five eye-witnesses all described a similar robber.

*United* States *v. Donaldson*, 978 F.2d 381, 391 (7th Cir. 1992).  And in the *Rivera* case cited by the Third Circuit:

> The joinder was proper. Counts one, two, three and four share a "general likeness" in terms of the conduct and events alleged: over a four-month period, Rivera targeted Brian, Garrett, Michael, David in Internet chat rooms; exchanged sexually explicit messages and photographs with them; and enticed them to meet for illicit sexual encounters. During one of those encounters, Rivera took the photographs that form the basis of count four. And some of the same exhibits were used to prove counts one, two and three: the dossiers Rivera maintained of his sexual experiences, which listed Garrett and Brian; and the transcript of an Internet chat in which Rivera said that he had abused five boys, including Garrett and Brian. As to count five (possession of child pornography), we agree with the Eleventh Circuit that "child molestation and child pornography ... plainly represent acts of 'similar character' involving the extraordinary mistreatment of children." <u>*United States v. Hersh,* 297 F.3d 1233, 1242 (11th Cir. 2002)</u>. Accordingly, the five counts were properly joined.

*United States v. Rivera*, 546 F.3d 245, 253-54 (2d Cir. 2008).

The mere fact that the two different charges in the present case are both fraud charges is of no moment to the joinder analysis. *United States v. Ramallo-Diaz,* 455 F.Supp.2d 22, 29-30 (D.P.R. 2006) (a conspiracy to embezzle union dues was misjoined with a conspiracy to embezzle funds from the union's health plan); *United States v. Quinn,* 365 F.2d 256, 264 (7th Cir. 1966)(Court of Appeals reversed for misjoinder of two separate bank misapplication schemes even though involving the same bank and even though occurring only a few months apart).

6

The evidence at trial showed that the timeshare scheme and the unemployment scheme were not interconnected in any way.  In this respect, the present case is markedly different from prosecutions in which joinder is permitted, e.g., *United States v. Riley*, 621 F.3d 312 (3d Cir. 2010).   In cases such as a tax fraud case linked to some other crime, joinder may be justified by an allegation that the one arose directly out of the other by virtue of the necessity of concealment being an integral part of the criminal enterprise.  *See, e.g., United States v. Bibby*, 752 F.2d 116 (6th Cir. 1985); *United States v. Bennett*, 702 F.2d 833 (9th Cir. 1983).   In contrast, the two different fraud charges against Ms. Manzoni were completely separate, not integral parts of the same criminal enterprise.

Recognizing the great risk of unfair prejudice in joining disparate offenses for trial, the courts look for real and understandable connection between criminal schemes that are to be tried together and not mere cosmetic similarities or factual overlaps.  *See United States v. Nicely*, 922 F.2d 850, 855 (D.C. Cir. 1991) ("identifying the common objective as making money and the shared *modus operandi* as telling lies are patently insufficient grounds for joinder.").  What the courts look for -- and what is missing here -- is a logical relatedness, *United States v. Lloyd*, 10 F.3d 1197 (6th Cir. 1993) ("logically related"), or a common scheme or plan.  *United States. Suggs*, 531 F.Supp.2d 13(D.D.C.  2008) (common scheme or plan required); *United States v. Santoni*, 585 F.2d 667 (4th Cir. 1978) (common scheme or plan).

While Rule 8(b) affords prosecutors some leeway in joining various charges that are part of an overarching criminal enterprise, the Rule does not dispense with the nexus or common scheme requirement.  *United States v. Giampa,* 904 F.Supp.

235 (D.N.J. 1995).  To the contrary, the Courts recognize that the inherent prejudice of presenting a jury with unrelated charges against a defendant is so great that misjoinder under Rule 8(b) is prejudicial per se.  *Id.*

The Court, now having the advantage of seeing the trial play out, can understand the substantial prejudice of a joint trial and the lack of basis for joinder. Thus, based on the considerations underlying F.R.Crim.P. 8 as well as F.R.Crim.P. 14, the Court should grant Ms. Manzoni a new trial.

II.     THE CASE AGENT'S OVERVIEW TESTIMONY WAS
        <u>INADMISSIBLE AND HIGHLY PREJUDICIAL</u>

The prosecution's use of so-called "overview testimony" by the FBI case agent contained substantial inadmissible hearsay and conclusion.  Especially given the sweeping scope of the testimony and its position as the first two days of supposed "evidence," it had the inevitable effect of unfairly prejudicing the jury.  While some overview testimony is allowable to place a complicated scheme in context, the case agent testimony in this case went far beyond that.  A simple example of the manner in which the agent's testimony was used to taint the jury was the prosecution's gratuitous insertion of the agent's conclusions into one of the most mundane aspects of his testimony, the collection of telephone record evidence:

> Special Agent Mesisca, did there come a time in your investigation when you attempted to contact a representative of Wyndham?
> A. Yes.
> Q. When was that?
> A. I think I started the process about, sometime in late August of 2010.
> Q. Incidentally, where is Wyndham headquartered?
> A. I believe their headquarters are in Orlando, Florida.
> **Q. Why did you reach out to Wyndham?**
> **A. The investigation was telling and showing me that there was various customers that could have been victimized from Wyndham.**

> Q. Did you continue your investigation after speaking with a Wyndham
> representative?
> A. Yes.
> Q. Did you subpoena any phone records in the course of your
> investigation?
> A. I did, yes.

Trial Transcript, 7/23/2013, p. 32-33 (emphasis added).   Having made the prejudicial

point that the agent had already concluded there were "victims," the prosecutor moved on

to a different area of inquiry.  This was not legitimate overview evidence, it was improper

injection of prejudicial opinion and conclusion.  Any relevant phone records could have

been introduced in evidence – probably without objection – without any reference to the

agent's conclusions about victimization.   Instead, even before the jury heard from a

single fact witness, it had heard from the witness stand the repeated conclusions of the

FBI agent that a fraud had been committed.

       Not only were the agent's conclusions prejudicial and improper, but they

were often without any factual or logical foundation.  For example, in the context of

being questioned about Ms. Manzoni's handwritten notes, the agent was allowed to

speculate as to her state of mind and motive:

> A. The process, you know, you had various people calling and you had
> various managers and then also the contracts being sent out. So I think the
> consultants who made the calls wanted to make sure they got paid so they
> would keep a record  of what they did at their desk and then forward other
> copies to either Mr. Lacerda or Ashley Lacerda to send out contracts, and
> then, obviously, money would come in and they would get credit for that
> particular sales deal.

Trial Transcript, 7/23/2013, p. 70-71.   In fact, while Ms. Manzoni may have urged her

customers to sign the contract and send in their money, there was no evidence that Ms.

Manzoni was informed by VO Group management about when money was actually

received or what happened after that.  Ms. Manzoni's limited role and knowledge was at

9

the core of the defense.   The case agent's speculation was without evidentiary basis and undercut an important aspect of the defense.

Even before a single fact witness had taken the stand, the case agent not only had convicted Ms. Manzoni of participating in a fraud, but he had instructed the jury that a key exhibit about which they would hear testimony was an integral part of that fraud.  Referring to G-202, the email which eventually Vinnie Giordano confessed he had authored, the prosecutor asked:

> Q. Special Agent Mesisca, what is this document?
> A. This is a document that we found, I believe on Genevieve's desk which is a e-mail from Genevieve Manzoni at VO Group to a potential customer, Charlene Rutherford.
> Q. Does it appear whether the document was forwarded? Whether the original e-mail --
> A. Yes, it was forwarded from Genevieve to Adam Lacerda.
> Q. What does this document say?
> A. Do you want me to read it?
> Q. No. Have you had an opportunity to review it previously?
> A. It's like a -- **it's part of the bank settlement pitch**.

*Id*., p. 69-70 (emphasis added).  Thus, before the jury had heard any real evidence, they had been told by this law enforcement expert that an "email from Genevieve Manzoni" was part of the fraudulent scheme.

Compounding the prejudice regarding this crucial document, and despite the fact that by the time trial started Vinnie Giordano had acknowledged authorship of the critical email, the case agent disputed that fact.  When Ms. Manzoni's counsel tried to clear up the false impression of authorship that had been created by the case agent's direct testimony, the agent clung to his false characterization:

> Q. You understood that Genevieve Manzoni was not the author
> of those words, correct?
> A. Not correct.

Trial Transcript, 7/24/2013, p. 89.   Even when directly pressed to acknowledge that

Giordano had admitted authorship, the agent denied it:

> Other people besides Ms. Manzoni have also told you who wrote those
> words?
> A. I don't think so. I remember the person that she said wrote it has denied
> writing it.

*Id*., p. 90.   Not only did the agent falsely attribute authorship of this crucial document to

Ms. Manzoni despite having no personal knowledge on that subject, but he also was

permitted to voice an opinion giving the email great visibility in the jury's mind:

> Q. Based on your investigation, do you have an understanding
> of why Adam Lacerda freaked out when he saw that e-mail?
> A. Yes.

*Id*., p. 108-09.   The defense objected to the case agent being allowed to act as a mind

reader, but after an extensive colloquy, the case agent was permitted to testify as to his

"understanding":

> Q. But what was the understanding? Why did he freak out?
> A. You -- it's okay to answer?
> THE COURT: Yes.
> THE WITNESS: Because when you lie, you don't put
> that with a paper trail.

*Id*., p. 115.   It was highly prejudicial for the jury to be infected with this sort of

conclusion and characterization in the guise of admissible testimony from a law

enforcement agent who was essentially saying that he had conducted a thorough and

reliable investigation, and these were his findings.

More broadly, the agent was allowed to paint a stark picture of what the

VO Group callers did and did not say to customers based on nothing but his own

conclusions from hundreds of interviews:

Q. Special Agent Mesisca, based on your investigation, have you found any evidence that VO Group customers were told about foreclosure during a cancellation pitch?
A. Prior to the search warrant?
Q. Yes.
A. Not that I recall.
Q. And during a -- any evidence during a bank settlement pitch, was there any evidence to suggest customers were told about foreclosure during the bank settlement pitch?
A. Prior to search warrant, I don't recall any of those.

*Id.*, p. 105.   Thus, before a word of legitimate fact testimony, the jury had already been

spoon fed the results of dozens of un-cross-examined victim interviews, dressed up as

highly credible law enforcement conclusions.

The agent's "overview" testimony went well beyond the legitimate bounds

of such testimony and repeatedly contained inadmissible hearsay, improper opinion

testimony, and impermissible vouching.  The case agent's opinions, conclusions,

summaries of hearsay and presentation of the prosecutions case theory were inadmissible

and prejudicial.  The various fundamental prejudicial errors in the challenged overview

testimony in this case are succinctly explained by the First Circuit in a recent opinion

addressing precisely this controversial "overview testimony" technique:

As we have now said many times, overview testimony is problematic when it "consists of declarations by a witness—commonly a law enforcement officer involved in the investigation at issue—presented early during trial to describe the government's general theory of the case." *United States v. Vázquez–Rivera,* 665 F.3d 351, 356 (1st Cir. 2011). Such testimony commonly "relie[s] heavily on information told to [the witness] by others—i.e., on inadmissible hearsay—rather than on ... personal knowledge," *United States v. Meises,* 645 F.3d 5, 14 (1st Cir. 2011), and often "preview[s] the testimony of other witnesses," *id.* at 14 n. 13. In addition to the hearsay problem, overview testimony of this sort is "especially problematic because juries may place greater weight on evidence perceived to have the imprimatur of the government." *United States v. Flores–de–Jesús,* 569 F.3d 8, 17 (1st Cir. 2009) (quoting *United States v. Casas,* 356 F.3d 104, 120 (1st Cir. 2004)) (internal quotation marks omitted).

12

The prejudicial effect of this kind of testimony is heightened when an overview witness is permitted to testify to the ultimate issue in a criminal trial—the defendant's culpability. *See Meises,* 645 F.3d at 18 (noting that it is "patently unfair" for a case agent to testify to defendant's culpability). Furthermore, testimony regarding culpability is a form of lay opinion that will rarely, if ever, meet the requirements of Federal Rule of Evidence 701. *See* Fed.R.Evid. 701(b); *Vázquez–Rivera,* 665 F.3d at 358.

*United States v. Rodriguez-Adorno*, 695 F.3d 32, 37-38 (1st Cir. 2012).   The testimony in the current case contained all of the pitfalls identified in *Rodriquez-Adorno*, including massive reliance on inadmissible hearsay, and inadmissible lay opinion testimony particularly on criminality and defendant's state of mind.

The Fifth Circuit has couched its negative views of this sort of "overview" testimony even more sharply:

This Court has never had the opportunity to address **the use of an overview witness where the witness is put on the stand to testify before there has been any evidence admitted for the witness to summarize. We unequivocally condemn this practice as a tool employed by the government to paint a picture of guilt before the evidence has been introduced.** Permitting a witness to describe a complicated government program in terms that do not address witness credibility is acceptable. However, allowing that witness to give tendentious testimony is unacceptable. Allowing that kind of testimony would greatly increase the danger that a jury "might rely upon the alleged facts in the [overview] as if [those] facts had already been proved," or might use the overview "as a substitute for assessing the credibility of witnesses" that have not yet testified. *Scales,* 594 F.2d at 564. We hold, therefore, that the district court abused its discretion in allowing the government to utilize Martin as an overview witness to testify to issues in dispute.

*United States v. Griffin,* 324 F.3d 330, 349 (5th Cir. 2003) (emphasis added).

An additional problem in this case is that the jury was told that the agent's testimony and conclusions were based not on his own personal knowledge, but upon numerous interviews, which runs roughshod over the Confrontation Clause. *See United States v. Lopez*, 340 F.3d 169, 17-77 (3d Cir. 2008) (reversing for impermissible

13

hearsay); s*ee generally Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158

L.Ed.2d 177 (2004).   Presenting the inadmissible hearsay as a "summary" or a basis for

an "understanding" or as a conclusion that there was "no evidence" of a certain matter

does not obviate the Confrontation Clause concern; it heightens it.   If the agent were only

to have previewed the ultimate testimony of an eventual trial witness, the error might turn

out to be harmless if the declarant were ultimately cross-examined before the jury.   In this

case, however, the jury was presented in capsule form with the hearsay testimony of

dozens or hundreds of nameless, faceless witnesses whose statements were synthesized

and vouched for by an FBI agent, but who never faced cross-examination as the

Constitution requires.

Joining the growing tide of judicial criticism of this latest trend in

prosecutorial trial theatrics, the Second Circuit has roundly criticized the sort of broad,

opinion-laced "overview" testimony in dispute here.

> We begin by identifying the overarching concern raised by Agent Klemick's testimony. By stating that, in his opinion, Garcia was a "partner with Francisco Valentin in receiving cocaine from Walmer DeArmas," Trial Tr. at 98, Klemick was essentially telling the jury that he had concluded that Garcia was guilty of the crimes charged. Although opinion testimony, whether offered by a lay witness pursuant to Fed.R.Evid. 701, or by an expert pursuant to Fed.R.Evid. 702, is not inadmissible simply "because it embraces an ultimate issue to be decided by the trier of fact," Fed.R.Evid. 704, it is not properly received "merely [to] tell the jury what result to reach," *id.,* Advisory Committee Notes on 1972 Proposed Rules; *see* 4 *Weinstein's Federal Evidence* § 701.05 (2d ed.2004) (noting that courts should be wary of opinion testimony whose "sole function is to answer the same question that the trier of fact is to consider in its deliberations"). Indeed, the purpose of the foundation requirements of the federal rules governing opinion evidence is to ensure that such testimony does not so usurp the fact-finding function of the jury. *See* Fed.R.Evid. 704, Advisory Committee Notes on 1972 Proposed Rules.

> Mindful of this concern, this court has, in two recent cases—both decided after the trial of this case—ruled it error to allow law enforcement

witnesses to express opinions as to defendants' culpability based on the totality of information gathered in the course of their investigations. *See United States v. Grinage,* 390 F.3d at 749–51 (rejecting receipt of such evidence as lay opinion under Rule 701); *United States v. Dukagjini,* 326 F.3d at 54 (rejecting receipt of such evidence as expert opinion under Rule 702). The circumstances of this case warrant no different conclusion. They do, however, afford us an opportunity to discuss the particular foundation requirements of Rule 701 and to reject the argument advanced by the government in its brief that a case agent may offer, at the beginning of a trial, a lay opinion providing a summary overview of anticipated evidence.

*United States v. Garcia*, 413 F.3d 201, 210-11 (2d Cir. 2013)

The Third Circuit, while not yet having issued a blanket condemnation of this broad "overview" technique, clearly is concerned. In a not-for-publication opinion, a panel of the Court acknowledged the line of authority cited above and took pains to distinguish the case before it from the improprieties identified by the First and Fifth Circuits.

Specifically, in regard to Figaro's argument that Trooper Hutson's testimony constituted improper "overview testimony," we note first that Trooper Hutson's testimony was not of the sort described by the two Courts of Appeals to have addressed the propriety of "overview testimony." *See United States v. Casas,* 356 F.3d 104, 117–24 (1st Cir. 2004) (DEA Agent testimony describing scope of drug smuggling "organization" and providing conclusory testimony as to the identity of the members of the "organization" was unacceptable overview testimony); *United States v. Griffin,* 324 F.3d 330 (5th Cir. 2003) (FBI Agent testimony using chart and providing overview of case against defendants improperly allowed). In the two cases cited by Figaro, the testimony at issue provided a comprehensive view of the case against the defendants at the start of testimony and included conclusory statements as to the identities of the participants of the conspiracies. Trooper Hutson's testimony does bear some similarity to that discussed in *Casas* and *Griffin* in that it came from a law enforcement official at the start of the trial. It is, however, distinguishable because, rather than telling the story of the conspiracy according to the Government, it told the story of Trooper Hutson's investigation in the case. Trooper Hutson did not attempt to explain the operations of the alleged conspiracy, nor did he identify the members of the conspiracy. Although Trooper Hutson did use the word "coconspirators," he did not associate the label with anyone in particular as did the witness in *Casas.*

15

*United States v. Figaro,* 126 Fed.Appx. 75, 78, 2005 WL 678757 (3d Cir 2005) (not for publication). Crucially, the Third Circuit took pains to distinguish the facts before it from the prejudicial aspects identified in the cited cases, concluding that the testimony neither gave a comprehensive overview of the case nor offered conclusions on key issues. (In *Figaro*, the key issue was the identities of the members of the drug operation.) In the present case, the agent's testimony was sweeping and his opinions focused on key issues.[1]

Permissible overview testimony "must be limited to a description of the investigation, and may not shade into a statement of the government's theory of the case or conclusory statements about the defendant's culpability." *Rodriquez-Adorno, supra*, 695 F.3d at 38. The "overview" evidence in this case not only constitutes inadmissible hearsay but is an improper attempt to convey a message to the jury that it should accept key elements of the prosecution's case because a highly regarded law enforcement agency conducted a thorough investigation and came to that conclusion. Such vouching is improper. *United States v. Gomes*, 642 F.3d 43, 47 (1st Cir. 2011). The case agent testimony in this case was improper, highly prejudicial, and is grounds for a new trial.

III.   THE DAVID JASPER  "PIPELINE" TAPE WAS
       INADMISSIBLE AND HIGHLY PREJUDICIAL

The Court should grant a new trial in light of the admission of a highly prejudicial tape recording of David Jasper claiming that Ms. Manzoni was a thief and a

---

[1]  In a drug conspiracy typically there is no dispute that a crime was committed; the question is who participated. In contrast, in a fraud case, identity is rarely at issue; the question is who said what and with what knowledge and intent. Thus, the agent's pronouncement here that none of the customers were told about foreclosure (and this would include the customers Genevieve Manzoni spoke to) goes directly to a central issue in the case).

liar, and asserting that Ms. Manzoni had made certain key mis-statements in a conversation to which he was not even a party. This issue arose relatively late in trial as a result of voluminous "Pipeline" documents which defendant Lacerda produced to the prosecution during the defense case. The prosecution marked certain of the Pipeline documents as exhibits, which Ms. Manzoni's defense received for the first time in August, late in the trial.

When the prosecution first sought to use the Pipeline material, Ms. Manzoni objected:

> MR. JACOBS: ... . My concern is spillover, and under Rule 403 I would ask the court not to allow any further inquiry into this area at all. The spillover concern is not just the general concern of evidence relating to a co-defendant but of the specific concern that on page 13 and 14 of the government's brief there is a reference to certain calls to the Jaspers, and as I read it there were calls made in August 2012 and June 2013. As your Honor may recall, my client left the VO Group in June of 2011, so these calls are more than a year and in one case I guess two years after she left. I would rather not have to get into trying to educate and remind the jury about this line of demarcation and the fact that it's the Jaspers, and Mrs. Jasper testified. I think just inevitably it is going to make that evidence resonate against my client even if your Honor tells the jury not to.

Trial Transcript, 8/12/2013, p. 28. In addition to objecting on Rule 403 grounds, Ms. Manzoni's counsel noted that the Pipeline evidence was only recently produced in the middle of a document intensive trial which compounded the difficulties the defense would have:

> In fact, this whole Pipeline thing is new to me, I didn't -- I don't recall seeing it in any of the prosecution's discovery, and I don't think the prosecution had anything before the trial started, and I always thought of it as something kind of out in left field, at least as far as I'm concerned. If we are going to get into this kind of mini trial, I guess I need to really educate myself about the pipeline.

It's my impression the whole system didn't exist when my client was there, although I'm not even sure of that, and I hate to delay the trial, but I would at least ask for some period of time to educate myself against this new thing we're getting into. It's more of a, you know, opening of the floodgates than just turning on a little pipeline, if you will excuse the pun. But for that reason, which is a serious reason, as I know your Honor understands, I would ask you under Rule 403 to just stop it right there.

*Id.*, p. 29-30.  The Court overruled the objection and the prosecution was permitted to use the Pipeline evidence.

During the prosecution's cross-examination of one of Adam Lacerda's witnesses, Dennis Nadeau, the prosecution sought to play a tape recording of a telephone call made by that witness to David Jasper, the husband of Marie Jasper who had testified about her dealings with Ms. Manzoni.  The tape was not offered as evidence against Ms. Manzoni but was purportedly relevant only to impeach the witness.  Ms. Manzoni's counsel objected, noted that he had had an opportunity to listen to the tape, and voiced the concern that the tape might contain prejudicial hearsay references to Ms. Manzoni.

The prosecutor responded that it was only being offered to impeach the witness:

MR. JACOBS: I have a different concern. As I recall, the Jaspers were a customer of Ms. Manzoni and, I don't have the note in front of me, I just wonder whether there's any reference to Ms. Manzoni in the note.
MS. OSWALD: In the particular call there's -- she's not referenced by name, although she is referenced, he speaks in terms of a she.
MR. JACOBS: I guess my concern is that this is – do you have a copy of -- is there a transcript of this?
MS. OSWALD: No, this was among the materials that were provided mid-trial by VO Financial.
THE COURT: Frankly, you know, I'm --
MR. JACOBS: I'm just concerned that this might be some indirect hearsay about some conversation Ms. Manzoni had several years earlier, and without having a transcript or having listened to it --
MS. OSWALD: This is being used to show Mr. Nadeau's knowledge of why these Pipeline notes were used to contact victims after the charges. The picture that's been presented by Mr. Cedrone and Mr. Nadeau is that he didn't know who was charged and he contacted Ms. Culver without knowing this and this is to impeach that testimony, it's one example.

18

THE COURT: I'm going to allow this.

Trial Transcript 8/26/2013, p. 65.  It turned out that the tape contained devastating prejudicial hearsay, a scathing indictment of Ms. Manzoni as a "thief" and "deceitful" and a "damn liar" who  "ripped me off."  Mr. Jasper's emotional and vulgar tirade had dramatic impact on the juror.  Although he was not even a party to the conversation in question, he claimed that Ms. Manzoni "misrepresented herself" and that his wife was "fraudulently enticed."  It is clear that the primary reason the prosecution played the tape was not for any legitimate impeachment of the witness, Dennis Nadeau, but to elicit Mr. Jasper's hearsay recapitulation of his view of Ms. Manzoni's statements and his hyper-emotional conclusion that "you people were crooks" and "you all can rot in jail." (Exhibit G-2006A).

The Court gave a limiting instruction that the evidence of calls to Mr. Jasper and others was only offered to show that the defendants who authorized the calls – not Ms. Manzoni who had left the VO Group over a year earlier – were engaged in cover-up or witness tampering.  The Court explained:

> This evidence of other acts was admitted only for a limited purpose. You may consider this evidence only for the purpose of deciding whether the defendant was conscious of his or her guilt of the crimes charged. Do not consider this evidence for any other purpose. The evidence was not offered and you are not no consider it against any defendant other than Ashley Lacerda or Adam Lacerda. Of course, it is for you to determine whether you believe this evidence and, if you do believe it, whether you accept it for the purpose offered. You may give it such weight as you feel it deserves, but only for the limited purpose that I have described to you. The defendants are not on trial for committing these other acts. You may not consider the evidence of these other acts as a substitute for proof that defendants committed the crimes charged. You may not consider this evidence as proof that a defendant had a bad character or any propensity to commit crimes. Specifically, you may not use this evidence to conclude that because the defendant may have committed the other acts, he or she must also have committed the acts

> charged in the indictment. Remember that each defendant is on trial here
> only for the specific charges set forth in the indictment. Do not return a
> guilty verdict unless the government proves the crimes charged in the
> indictment beyond a reasonable doubt.

*Id.*, p. 138-39.   While this instruction stated in antiseptic terms the proposition that the

tape was not being offered against Ms. Manzoni, the instruction did nothing to dispel the

strong and prejudicial emotional impact of Mr. Jasper's tirade.  Coming as it did on the

last day of testimony only heightened its improper impact on the jury.   Even standing

alone, this evidence was dramatically and unfairly prejudicial.  Considered in

combination with the other errors complained of, a new trial is warranted.


IV.    THE EVIDENCE WAS INSUFFICIENT
       TO SUPPORT MS. MANZONI'S CONVICTION

            The evidence in this case is not sufficient to show that Ms. Manzoni joined

in the overarching VO Group scheme charged in the indictment.  The evidence shows, at

most, that a jury could have concluded that Ms. Manzoni may have said things that were

not true.  However, the evidence does not support the conclusion that she knew they were

untrue at the time she said them.  And even if there were snippets of testimony that she

said something untrue that she might have known was untrue (e.g., that she represented

Wyndham), such testimony, even if believed, would only be evidence of an independent

false statement, not part of the overarching VO Group fraud.

            This case is on all fours with *United States v. Pearlstein*, 576 F.2d 531(3d

Cir. 1978), in which the Court of Appeals reversed the fraud conviction of sales people

who delivered a pre-scripted sales presentation, holding that there was insufficient

evidence that the defendants knew of the falsity of the sales pitch they were presenting.

While there was ample evidence from which the jury in this case could concluded that the

VO Group sales pitch was false, there was nothing about it that Ms. Manzoni would have known was false on her first day of work, or second, or third, or any of the time during the month or so that the pitch in question was given prior to the FBI search, after which the "settlement pitch" was abandoned.

The prosecution makes much of the fact that there were misrepresentations in what it terms the "settlement pitch."  However, as the *Pearlstein* Court noted:

> Examining the testimony bearing on each of these misrepresentations as they relate to the individual defendants indicates that there was no evidence from which the jury reasonably could have concluded that the salesmen had knowledge of their false and misleading nature.

*United States v. Pearlstein, supra*, 576 F.2d at 542-43.   Ms. Manzoni was not involved in crafting the sales pitch.  During the month of October, when she made the phone calls that are the basis for the charges against her, she had no idea what the VO Group ultimately did with respect to the customers who signed contracts with the VO Group. The fact that the customers may ultimately not have received what the VO Group promised to deliver is no evidence that Ms. Manzoni willfully joined the conspiracy. And once she realized that the VO Group was not delivering on its promises, she left.

Merely delivering the VO Group sales pitch to prospects over the telephone is insufficient basis for a conviction.

> Moreover, the relevant inquiry is not whether the defendant acted knowingly in making any misstatement, but whether she did so with respect to the overarching fraudulent scheme -- that is, the particular "illicit enterprise" charged in the indictment.

*United States v. Dobson*, 419 F.3d 231, 237 (3d Cir. 2005).  In this case even if the jury believed, for example, that Ms. Manzoni had claimed to represent Wyndham, such a false statement would not be consistent with the overarching VO Group scheme.

Because the evidence did not show that Ms. Manzoni knew the pitch was false when she was making use of it, she is not guilty of the crime charged.

V.      THE COMBINATION OF TRIAL CIRCUMSTANCES AND
        <u>UNFAIRLY PREJUDICIAL EVIDENCE WARRANT A NEW TRIAL</u>

While there is an often repeated standard that a defendant is not entitled to a perfect trial, the circumstances in this case in combination resulted in Ms. Manzoni receiving not only an imperfect trial but one in which the risk of a verdict based on prejudicial spillover and improper evidence was so great that a new trial should be granted.  There were a significant number of factors, in addition to the points raised above, which combined to prejudice Ms. Manzoni, and she incorporates by reference her prior objections of records.

The vast majority of the evidence in this case focused on Adam Lacerda and the VO Group enterprise as a whole.  As a consequence, there was a great risk of guilt by association.  If the jury were convinced that the VO Group were fraudulent through and through, there was a grave danger Ms. Manzoni could have been viewed as guilty merely by the fact that she worked there, dealt with so many customers, and made as much money as she did.  This magnified the prejudice of any error.

For example, because her knowledge and state of mind were critical to the scienter element and to her good faith defense, the FBI agent's testimony about her statements to him loomed large.  Even slight and nuanced differences in language could be critical.  For that reason, the failure to provide the agent's handwritten notes of the interviews about which he testified was a clear and important Jencks Act violation.

The discovery difficulties which, in another case might be dismissed as the ordinary logistical difficulties of any litigation, assumed greater significance in this case.

The lack of a bill of particulars was important, not only in terms of informing the defense of what evidence to anticipate, but to articulate what knowing falsity was being urged as to Ms. Manzoni as opposed to other defendants or the VO Group as a whole.  This lack was noticeable in the treatment of the crucial email which the prosecution seemed to be saying at various times that Ms. Manzoni authored or did not.  Where, as here, falsity is an aspect of the offense charged in the indictment, a bill of particulars is appropriate in order to inform the defendant of precisely what it is the government alleges to have been false.  *See United States v. Tucker*, 473 F.2d 1290, 1293 (6th Cir. 1973).  The Third Circuit has found it to be reversible error to fail to provide the defense with a bill of particulars setting forth precisely what it was which the government did not believe to be true and the particularized facts on which the government will rely in support of the allegation of falsity.  *United States v. Slawik*, 548 F.2d 75, 79, 83 (3d Cir. 1977); *see generally United States v. Reilly,* 33 F.3d 1396, 1419-20 (3d Cir. 1994).

These and other objections to evidence and jury instructions previously made on the record, and incorporated by reference, collectively warrant a new trial.

<u>CONCLUSION</u>

Defendant's motion for judgment of acquittal should be granted.  In the alternative, a new trial should be ordered.

Respectfully submitted,

 /s Ralph A. Jacobs
_____
Ralph A. Jacobs
Jacobs Singer Kivitz & Herman LLC
34 Tanner Street
Haddonfield, NJ  08033
856- 427-0330
Attorney for Defendant, Genevieve Manzoni

Dated:  October 10, 2013

24